UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JEFFREY DAVENPORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 7-36-B-W |
| | ) | |
| CITY OF CARIBOU, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT**

Jeffrey Davenport has filed this action against the City of Caribou, the Chief of Police
Michael Gahagan, and Caribou police officers Barry Dombroski, Michael Poulin, and Shawn
Smith.  Davenport's claims stem from his interactions with officers on the night of May 11, 2006.
On this summary judgment record there may remain some metaphysical doubt  about whether or
not there was a "high speed" interaction between Davenport's maroon station wagon and a Saturn
containing "a carload of young men" -- interactions that did (or did not) precede the interaction
between Davenport and Officers Poulin and Smith, but as a matter of law there is no genuine
dispute of material fact that precludes the entry of summary judgment for the defendants.

Davenport did not succeed with a motion to suppress in his criminal case for operating
under the influence on an argument that the investigatory stop -- related to the supposed
interaction with the carload of young men-- violated the Fourth Amendment of the United States
Constitution.   In this 42 U.S.C. §  1983 action he still maintains that there was no second car, no
chase, and that he was parked in a parking lot for fifteen minutes prior to his encounter with the
law enforcement officers he is suing.

In his response to these motions for summary judgment filed by the defendants (Docket Nos. 17, 18, 19, 20, 21) Davenport defends claims of "civil conspiracy" and "unreasonable search and seizure"; he also charges Chief Gahagan with failure to train.[1]  I now recommend the court grant the defendants' five separate motions for summary judgment.  My reasons follow.

*Discussion*

### A.  Summary Judgment Standard

"At the summary judgment stage," the United States Supreme Court explained in <u>Scott v. Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. R. Civ. Proc. 56(c)).  <u>Scott</u> reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" <u>Id.</u> (quoting <u>Matsushita</u>

---

[1]        The defendants parsed Davenport's complaint for all possible claims and ably briefed them, tying the legal arguments in with the factual statements they put forth and supported.  As they point out: "[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived."  <u>Grenier v. Cyanamid Plastics</u>, 70 F.3d 667, 678 (1st Cir. 1995).  <u>See also</u> <u>Berry v. City of South Portland</u>, 525 F.Supp. 2d 214,233 (D. Me. 2007); <u>Dressler v. Cmty. Serv. Commc'ns, Inc.</u>, 275 F. Supp. 2d 17, 26 (D. Me. 2003).  <u>See also</u> <u>Wilcox v. Town of Pittsfield</u>, Civ. No. 07-27-B-W, 2008 WL 1925181, *1 n.1 (D. Me. Apr. 20, 2008) (Kravchuk, Mag. J., recommended decision). In this case I think it is particularly important to limit the plaintiff to the claims he defends and the arguments made in response to these dispositive motions because the defendants have gone to great length to defend this action based on a sprawling complaint.  Each defendant, represented by the same attorney, has filed a separate motion for summary judgment in the hopes of achieving an early, (perhaps) more cost-effective, pre-trial disposition of this action which is their right under the Federal and District of Maine rules.  They have filed a joint statement of material fact that is admirably supported by the necessary record evidence.  Davenport has filed his single memorandum  in opposition, thereby selecting the battles he wishes to fight, his response to the defendants' statement of material facts, and a handful of additional statements of facts.  Each defendant has filed a separate reply memorandum, (<u>see</u> Docket Nos. 28, 29, 30, 31, 32) along with a joint reply to the additional facts (Docket No. 33).
        As I indicate in my discussion of Davenport's failure-to-train claim, the process of summary judgment is somewhat  akin to a trial on paper, albeit a trial where every inference and properly admitted fact favors the nonmovant.  However, both at trial and at summary judgment you either get evidence into the record or you do not. If a party fails to get evidence 'admitted' that is key to the legal rights or defenses advanced, then that party cannot assert claims  – be it in closing argument or a summary judgment memorandum -- dependent on facts <u>not in evidence</u>.

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). Davenport cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'" *Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007) (quoting *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 55 (1st Cir. 2006)).

### Material Facts[2]

The plaintiff in this case is Jeffrey Davenport. (SMF ¶ 1; Resp. SMF ¶ 1.) Davenport alleges that he has been a lifelong resident of Caribou and is well known in the community as a homosexual man. (SMF ¶ 2; Resp. SMF ¶ 2.)

The City of Caribou conducts its business with a City Council/City Manager form of government. (SMF ¶ 3; Resp. SMF ¶ 3.) Stephen Buck is the City Manger for the City of Caribou. (SMF ¶ 4; Resp. SMF ¶ 4.) Chief Gahagan was appointed to the position of Chief of Police by the City Manager Stephen Buck. (SMF ¶ 5; Resp. SMF ¶ 5.) As a department head, Chief Gahagan is responsible for formulating all policies and regulations in the area of police operations, training, and discipline. His job description has been marked as Exhibit BB for discovery in this lawsuit. (SMF ¶ 6; Resp. SMF ¶ 6.) Only the City Manager has the power to remove department heads. (SMF ¶ 7; Resp. SMF ¶ 7.) Neither the City Manager nor the Caribou City Council is responsible for making policy or regulations concerning police operations, training and discipline. (SMF ¶ 8; Resp. SMF ¶ 8.)

---

[2]    Not all of the following facts turn out to be 'material' to the claims that I consider preserved at this stage of the litigation.  However, I think it is important to address the record in full at this juncture as this is a recommended disposition and if there are objections to and reconsideration of this recommended decision the factual record put in play in the initial pleadings would be the relevant foundation for any further review.

Redland Insurance Company issued two liability policies 1) a Law Enforcement Professional Liability Policy, No. XG41000060;  and 2) a Commercial General Liability Policy, No. CGDS 01 1001 to the City of Caribou with effective dates July 1, 2005 through July 1, 2006. Redland Insurance Company is providing for the City of Caribou's defense in the above captioned action under these policies. (SMF ¶ 9; Resp. SMF ¶ 9.)  The Liability Coverage in the above insurance policies contains limits of liability endorsement which provided: $400,000 per occurrence, $1,000,000 General Aggregate Limit of liability for causes of action seeking tort damages pursuant to the provisions of the Maine Tort Claims Act (14 M.R.S.A. 8101, et seq.). Coverage is limited to those areas for which governmental immunity has been expressly waived by 14 M.R.S.A. 8104-A, as limited by 14 M.R.S.A. 8104-B, and 14 M.R.S.A. 8111.  Coverage amounts for causes of action seeking tort damages pursuant to the provisions of the Maine Tort Claims Act are limited to those specified in 14 M.R.S.A. 8105 and 8104-D.  Liability coverage shall not be deemed a waiver of any immunities or limitation of damages available under the Maine Tort Claims Act, other Maine Statutory Law, judicial precedent or common law. One Million Dollars per occurrence, Three Million Dollars general aggregate limit of liability for all causes of action seeking tort damages pursuant to Federal Law or State Law for which immunity of limitation of damages is not provided by the provisions of the Maine Tort Claims Act (14 M.R.S.A. 8101, et seq.) (SMF ¶ 1 ; Resp. SMF ¶1 .)  The City of Caribou received a Notice of Claim from Mr. Davenport in connection with his arrest of May, 11, 2006. (SMF ¶ 11; Resp. SMF ¶11.)   The Notice of Claim contains no reference to causes of action for assault and malicious prosecution. (SMF ¶ 12; Resp. SMF ¶12.)

    Michael Gahagan has been with the Caribou Police Department for 33 years and has served as its Chief for the past three years. (SMF ¶ 13; Resp. SMF ¶13.)  Before assuming the

title of Chief of Police, Chief Gahagan was Captain under the former chief. (SMF ¶ 14; Resp. SMF ¶14.)  Chief Gahagan has been continuously employed by the City of Caribou since 1973. He started his employment with the Caribou Police Department as a patrolman, was promoted to Sergeant in 1985, and was subsequently promoted to Lieutenant in 1996, with responsibility for internal affairs investigations.  (SMF ¶ 15; Resp. SMF ¶15.)  Chief Gahagan graduated from Caribou High School in 1970.  He graduated from the University of Maine at Presque Isle in 1978 with an Associate Degree in Criminal Justice. (SMF ¶ 16; Resp. SMF ¶16.) Chief Gahagan also served as Chief of Police in Limestone, Maine on a part-time basis for approximately one year during 2004 to 2005. (SMF ¶ 17; Resp. SMF ¶17.)

On May 11, 2006, Michael Poulin was a certified reserve officer employed by the Caribou Police Department.  On that date, he was serving as a patrol officer. (SMF ¶ 18; Resp. SMF ¶18.)  Officer Poulin started with the Caribou Police Department on December 21, 2005, as a reserve officer.  (SMF ¶ 19; Resp. SMF ¶19.) Officer Poulin was working a full-time schedule in place of a certified police officer who had been deployed in Iraq through the Maine National Guard.  (SMF ¶ 20; Resp. SMF ¶20.) Officer Poulin is a high school graduate with one year of vocational technical training in building construction trades. (SMF ¶ 21; Resp. SMF ¶21.). Officer Poulin completed the 100 hour reserve officer training at the Maine Criminal Justice Academy in 1995.  (SMF ¶ 22; Resp. SMF ¶22.)  After completing the 100 hours of training, Officer Poulin was certified to serve as a reserve officer in the State of Maine. (SMF ¶ 23; Resp. SMF ¶23.)  Since completing his training, Officer Poulin has been affiliated as a reserve officer with the Fort Fairfield Police Department, Limestone Police Department, Caribou Police Department, and the Aroostook County Sheriff's Department. (SMF ¶ 24; Resp. SMF ¶24.) Officer Poulin had no contact with Mr. Davenport prior to May 11, 2006. (SMF ¶ 24; Resp. SMF

5

¶25.) Prior to May 11, 2006, Officer Poulin did not know of Davenport's sexual orientation. (SMF ¶ 26; Resp. SMF ¶26.) Mr. Davenport's knowledge of Officer Michael Poulin is limited to "after the fact" information about Poulin's prior employment. (SMF ¶ 27; Resp. SMF ¶27.)

On May 11, 2006, Barry Dombroski was a certified police officer employed by the Caribou Police Department.  (SMF ¶ 28; Resp. SMF ¶28.)  Officer Dombroski began his employment with the Caribou Police Department on April 23, 1985. (SMF ¶ 29; Resp. SMF ¶29.) Officer Dombroski was serving as dispatcher on the night of May 11, 2006.  (SMF ¶ 30; Resp. SMF ¶ 30.)  Officer Dombroski graduated from Caribou High School in 1980.  He attended the University of Maine at Orono from 1981 and 1982 before attending, and graduating from, the Maine Criminal Justice Academy in 1985. (SMF ¶ 31; Resp. SMF  ¶31.)  Officer Dombroski was certified as a Police Officer in the State of Maine at the completion of the training course at the Maine Criminal Justice Academy.  (SMF ¶ 32; Resp. SMF ¶ 32.)

On May 11, 2006, Shawn Smith was a certified police officer employed by the Caribou Police Department. (SMF ¶ 33; Resp. SMF ¶33.)  Officer Smith was serving as a patrol officer on the night of May 11, 2006.  (SMF ¶ 34; Resp. SMF ¶34.)   Officer Smith started his employment with the Caribou Police Department on September 13, 2005. (SMF ¶ 35; Resp. SMF ¶ 35.)  Officer Smith graduated from Houlton High School in 1988. He attended the Law Enforcement Pre Service School at the Maine Criminal Justice Academy in 1993. He attended the Maine Criminal Justice Academy's 12-week Police Officer Training course and received his certification in 1996. (SMF ¶ 36; Resp. SMF ¶ 36.) Mr. Smith worked seven years for the Houlton Police Department (1995-2002).  (SMF ¶ 37; Resp. SMF ¶ 37.)  Before taking a position with the Caribou Police Department, Officer Smith had two years experience in the military police – United States Coast Guard (1989-1990). (SMF ¶ 38; Resp. SMF ¶ 38.)  Mr. Smith was

with the Caribou Police Department for approximately one year (2005-2006). (SMF ¶ 39; Resp. SMF ¶ 39.) Officer Smith had never met Mr. Davenport nor was he aware of Mr. Davenport's sexual orientation before May 11, 2006. (SMF ¶ 40; Resp. SMF ¶ 40.)

### *May 11, 2006- The Stop and Arrest*

On May 11, 2006, at approximately 11:35 p.m., Reserve Officer Michael Poulin was on patrol in a marked cruiser on Bennett Drive in Caribou. (SMF ¶ 41; Resp. SMF ¶ 41.) Officer Poulin turned into the Department of Motor Vehicles lot facing north toward Skyway Drive to speak with Sergeant Larry Goff of the Aroostook County Sheriff's Department, who was in the parking lot in a marked cruiser. (SMF ¶ 42; Resp. SMF ¶ 42.)

According to the defendants, at that time, Officer Poulin observed a maroon station wagon engage in a high speed pursuit of a second vehicle, a four door Saturn, on Skyway Drive in the City of Caribou. (SMF ¶ 43; Poulin Aff. ¶ 2.) Officer Poulin observed the station wagon pursue the Saturn into the parking lot, follow it closely, and then come to an abrupt stop behind it. (SMF ¶ 44; Poulin Aff. ¶ 2.)[3] Sergeant Goff also witnessed the same event. (SMF ¶ 45; Tr. Motion Hr'g 35:3-22, Docket No. 22-30.)[4] The station wagon made an abrupt left turn into the parking lot and accelerated quickly traveling west in the parking lot, then reversed direction and came to a stop facing the "Saves A Lot" store which is at the far end of Skyway Plaza. (SMF ¶ 46; Poulin Aff. ¶ 3.) Officer Poulin saw the vehicle come to a stop in the large parking lot and

---

[3]         Davenport denies this statement by stating:  "The radio traffic indicates the Saturn did not turn into the parking lot, but continued on towards Route 1 and was pursued by a different Caribou Police Officer."  He cites to his Exhibit 3 which is some sort of summary sheet for the radio log that lists seven non-descript entries.
[4]         Davenport denies this statement by asserting:  "Goff was parked facing away from the road and could not have seen a high-speed pursuit.  There wasn't one."  (Resp. SMF ¶ 45.)  He cites to the Goff Incident Report (Davenport Ex. 6) which only supports a conclusion that Goff did witness the events  -whether or not he was looking through his front windshield, the side windows, his rear window, or his mirrors.

elected to investigate the incident. (SMF ¶ 47; Poulin Aff. ¶ 3; Tr. Motion Hr'g 8:4-15, Docket No. 22-30.)

Davenport counters that he was driving a station wagon and that he was not speeding. (Resp. SMF ¶ 43; Davenport Aff. ¶ 2; id. ¶ 6.)[5] He asserts that he did not turn abruptly and did not speed across the parking lot. (Resp. SMF ¶ 46; Davenport Aff. ¶¶3,6.)[6] Davenport maintains that Officer Poulin waited approximately fifteen minutes before deciding to investigate. (Resp. SMF ¶ 47; Davenport Aff. ¶ 7.)[7]

There is no dispute that Officer Poulin radioed Officer Smith and asked that he pursue the Saturn that was headed north. (SMF ¶ 48; Resp. SMF ¶ 48.)   As the station wagon was already stopped in the parking lot, Officer Poulin did not activate the blue lights on his police vehicle but positioned his vehicle diagonally off the left front bumper of the station wagon. (SMF ¶ 49; Resp. SMF ¶ 49.) The driver of the vehicle was later identified as Jeffrey Davenport.  (SMF ¶ 50; Resp. SMF ¶ 50.) Mr. Davenport conceded that when Officer Poulin got out of his vehicle he was not shouting, pointing or doing anything that would seem aggressive. (SMF ¶ 51; Resp. SMF ¶ 51.)  Mr. Davenport rolled down the window on his own to talk with the officer. (SMF ¶ 52; Resp. SMF ¶ 52.)   Officer Poulin approached Mr. Davenport's vehicle and asked him for his operator's license. (SMF ¶ 53; Resp. SMF ¶ 53.)

According to the defendants, at that time, Officer Poulin informed Mr. Davenport that he had been operating erratically. (SMF ¶ 54; Poulin Aff. ¶ 4.) Per Davenport, Officer Poulin told

---

[5]      In his responsive paragraph Davenport represents that there was "no high-speed pursuit."  The affidavit statement on which he relies states only: "I was not speeding."

[6]      Davenport also maintains that he parked in the DHS building lot. (Resp. SMF ¶ 46.)  There is nothing in the two cited paragraphs of his declaration – or anywhere else in his declaration – that supports the assertion that he parked at the DHS building parking lot.

[7]      Davenport further asserts that he was finishing his second cigarette when Officer Poulin finished his cigarette but the cited paragraph of his declaration does not contain this representation.

him he had been speeding.  (Resp. SMF ¶ 54; Davenport Aff. ¶ 11.) There is no dispute that Mr.

Davenport later claimed that he was "being followed by a carload of young men." (SMF ¶ 55;

Resp. SMF ¶ 55.)

Mr. Davenport had a "Q" restricted license which prohibits his use of any alcohol

beverages before operating a motor vehicle. (SMF ¶ 56; Resp. SMF ¶ 56.)   Mr. Davenport told

Officer Poulin that he was aware of that restriction. (SMF ¶ 57; Resp. SMF ¶ 57.)  Officer Poulin

could tell that Mr. Davenport was in violation of the no alcohol restriction immediately as he

detected an overwhelming odor of alcohol on Mr. Davenport's breath. (SMF ¶ 58; Resp. SMF ¶

58.) Officer Poulin also observed that Mr. Davenport's speech was slow and slightly slurred and

that Mr. Davenport' eyes were glassy but not bloodshot.  (SMF ¶ 59; Resp. SMF ¶ 59.)  Officer

Poulin asked Mr. Davenport how much he had to drink and Mr. Davenport replied that he had

consumed a couple of Vodka drinks approximately one hour before. (SMF ¶ 60; Resp. SMF ¶

60.) Mr. Davenport does not know whether he consumed single or double drinks that evening.

(SMF ¶ 61; Resp. SMF ¶ 61.)  For Mr. Davenport to have had any alcohol would be a violation

of his license restriction which prohibits alcohol use of any amount. (SMF ¶ 62; Resp. SMF ¶

62.)

Officer Poulin inquired if Mr. Davenport had ingested any medication and Mr. Davenport

told Officer Poulin that he had taken one sleeping pill approximately six hours previously. (SMF

¶ 63; Resp. SMF ¶ 63.)  Mr. Davenport had taken this sleeping pill prior to leaving his house at

6:00 p.m. that evening. (SMF ¶ 64; Resp. SMF ¶ 64.)   Because he felt that the sleeping

medication he had ingested prior to leaving his home was not working, Mr. Davenport ingested

two more sleeping pills at approximately 9:30 p.m. (SMF ¶ 65; Resp. SMF ¶ 65.)   Mr.

Davenport stated to Defendant Poulin that he did not know if this sleeping pill was a prescription or over-the-counter medication. (SMF ¶ 66; Resp. SMF ¶ 66.)

According to the defendants, Officer Poulin next asked Mr. Davenport for the registration and insurance card for the vehicle. (SMF ¶ 67; Poulin Aff. ¶ 6.) Mr. Davenport reached for the license and registration documents slowly and deliberately and, upon retrieval, fumbled with the vehicle documentation. (SMF ¶ 68; Poulin Aff. ¶ 6.)[8] Officer Poulin asked Mr. Davenport to perform a couple of in-vehicle sobriety tests. (SMF ¶ 69; Poulin Aff. ¶ 7.) The first test administered by Officer Poulin concerned reciting the alphabet. Officer Poulin asked Mr. Davenport to start with the letter C and recite through Q including C and Q. (SMF ¶ 70; Poulin Aff. ¶ 7.) Mr. Davenport stated he understood the alphabet test and recited "C, D, E, F, G, C, Q" with slightly slurred speech. (SMF ¶ 71; Poulin Aff. ¶ 7.) Officer Poulin next asked Mr. Davenport to count in order from 33 to 54. (SMF ¶ 72; Poulin Aff. ¶ 7; Resp. SMF ¶ 72.) Mr. Davenport counted 33, 34, 35, long pause, 36, 37, 38, 39, 40, 41, 42, 43, long pause, and then finished satisfactorily. (SMF ¶ 73; Poulin Aff. ¶ 7; Resp. SMF ¶ 73.) Officer Poulin observed that Mr. Davenport's speech was also slightly slurred while completing the number test. (SMF ¶ 74; Poulin Aff. ¶ 7; Resp. SMF ¶ 74.)

According to the defendants, Davenport was also asked to perform a finger touch exercise, touching his thumb to the tip of each finger on the same hand in order while counting out loud 1, 2, 3, 4, and back 4, 3, 2, 1, starting with his pinky finger and counting toward his pointer. (SMF ¶ 75; Poulin Aff. ¶ 8.) Mr. Davenport initially did not understand the exercise and Officer Poulin repeated his instruction and demonstrated the exercise. (SMF ¶ 76; Poulin

---

[8]      Davenport denies this statement by asserting he was never asked for any documents (Resp. SMF ¶ 68) but he has no record support for this assertion and I could not find such a statement in his declaration. He also maintains as part of this 'denial' that a check on his license plates was not run until after 3 a.m., a representation that is supported by his Exhibit A (See Docket No. 27-2.)

Aff. ¶ 8.)  After the repeat instructions, Mr. Davenport stated he understood, counted out of order, for the most part reversing numbers. (SMF ¶ 77; Poulin Aff. ¶ 8.) He could not touch his fingers together and crossed his fingers and thumb over each other while trying to do so. (SMF ¶ 78; Poulin Aff. ¶ 8.) Officer Poulin asked Mr. Davenport to exit the vehicle with the intention of conducting further testing. (SMF ¶ 79; Poulin Aff. ¶ 9.)

In response to this characterization of the sobriety test, Davenport maintains that his license plate was not run until 3 a.m.  (Resp. SMF ¶ 68; Ex. A.)  He admits that he was asked to count from 33 to 54 but insists that no other field sobriety tests were preformed.  (Resp. SMF ¶ 69; Davenport Aff. ¶¶ 14, 17.)  He was never asked to recite the alphabet.  (Resp. SMF ¶¶ 70,71; Davenport Aff. ¶ 17.)  He was never asked to perform a finger touch test.  (Resp. SMF ¶¶ 75, 76, 77, 78; Davenport Aff. ¶ 17.)  Officer Poulin, Davenport further represents, asked him to exit his vehicle after the single counting test and offered no other tests once Davenport was out of the car.  (Resp. SMF ¶ 79; Davenport Aff. ¶¶ 16, 17; Defs.' Ex. 10-5 (Smith Video).)

There is no dispute that, upon exiting the vehicle, Mr. Davenport was unsteady on his feet and had an overwhelming smell of intoxicating liquor about him. (SMF ¶ 80; Resp. SMF ¶ 80.) Once out of the vehicle, Mr. Davenport began slowly rocking back forth. (SMF ¶ 81; Resp. SMF ¶ 81.)  Officer Poulin determined that there was sufficient probable cause to believe that Mr. Davenport had committed the crime of operating a motor vehicle under the influence of intoxicating liquor (OUI) and took him into custody.  (SMF ¶ 82; Resp. SMF ¶ 82.)

Prior to Mr. Davenport's transport to the Caribou Police Department, Officer Smith arrived on the scene. (SMF ¶ 83; Resp. SMF ¶ 83.) Officer Shawn Smith's contact with Mr. Davenport is limited to events occurring after he is taken into custody and overhearing statements made by Mr. Davenport. (SMF ¶ 84; Resp. SMF ¶ 84.)  As he approached Officer

11

Poulin and Mr. Davenport, Officer Smith activated his in-vehicle video recorder. (SMF ¶ 85; Resp. SMF ¶ 85.)  Officer Smith's initial contact with Mr. Davenport is recorded on that videotape. (SMF ¶ 86; Resp. SMF ¶ 86.)  The video recording equipment contained in the City of Caribou Police Department vehicles consists of a camera mounted on the dashboard connected to a video recorder that is contained in a locked box in the trunk of the vehicle. (SMF ¶ 87; Resp. SMF ¶ 87.)  The clock on the video record is set manually at the time of the installation in the vehicle by the installer. (SMF ¶ 88; Resp. SMF ¶ 88.)   The officers operating the vehicles do not have access to the video recorder contained in the trunk. (SMF ¶ 89; Resp. SMF ¶ 89.)

 Officer Smith stopped his vehicle a short distance away from, and directly behind, Mr. Davenport's vehicle during which time Mr. Davenport was stepping out of his vehicle. (SMF ¶ 90; Resp. SMF ¶ 90.)  As Mr. Davenport was being escorted to Officer Poulin's cruiser, Officer Smith exited his vehicle and approached the Davenport vehicle on foot. (SMF ¶ 91; Resp. SMF ¶ 91.)   Officer Smith had nothing to do with Mr. Davenport's arrest. (SMF ¶ 92; Resp. SMF ¶ 92.)

Once inside the cruiser, Mr. Davenport advised the officers of a lit cigarette in his vehicle. (SMF ¶ 93; Resp. SMF ¶ 93.) Officer Smith went over to Davenport's vehicle and extinguished the lit cigarette. In addition, Officer Smith retrieved Mr. Davenport's wallet and brought it over to him. (SMF ¶ 94; Resp. SMF ¶ 94.)   Incident to the arrest of Mr. Davenport, the officers conducted a brief plain view search of the inside of the vehicle. (SMF ¶ 95; Resp. SMF ¶ 95.)   The key was taken out of the ignition of Mr. Davenport's vehicle and the doors closed and locked. (SMF ¶ 96; Resp. SMF ¶ 96.) Given the location of the vehicle -- an empty parking lot -- the officers elected not to have it towed. (SMF ¶ 97; Resp. SMF ¶ 97.)  Except for

his car keys, nothing was taken from Mr. Davenport's vehicle. (SMF ¶ 98; Resp. SMF ¶ 98.) The keys were given to Mr. Davenport by the officers. (SMF ¶ 99; Resp. SMF ¶ 99.) Officer Poulin transported Mr. Davenport to the Caribou police station. (SMF ¶ 100; Resp. SMF ¶ 100.)

Chief Gahagan was not present during the late evening and early morning hours of May 11 and May 12, 2006, when Jeffrey Davenport was arrested at the Skyway Mall and later processed at the Caribou Police Department. (SMF ¶ 101; Resp. SMF ¶ 101.) Chief Gahagan left the Caribou Police Department at 5:00 p.m. on May 11, 2006, and returned at 7:30 am on May 12, 2006. (SMF ¶ 12; Resp. SMF ¶ 102.)

### In the Booking Room

At the Caribou Police Department, Mr. Davenport was led into the building and into the secure area booking room. (SMF ¶ 108; Resp. SMF ¶ 108.) The booking room is monitored by a video camera with a microphone. (SMF ¶ 109; Resp. SMF ¶ 109.) Mr. Davenport's entire stay in the booking room is the subject of a videotape with an audio component. (SMF ¶ 110; Resp. SMF ¶ 110.) The video recording equipment present in the booking room of the City of Caribou Police Department, which includes the location of the Intoxilyzer machine, consists of a stationery camera mounted on the wall and a video cassette recorder. (SMF ¶ 111; Resp. SMF ¶ 111.) The time on the video cassette recorder was set at the time of installation, much as one would set the clock on an in-home video cassette recorder. (SMF ¶ 112; Resp. SMF ¶ 112.) The booking room video runs approximately 63 minutes. The times shown on the booking room video represent activity that occurred after approximately 11:45 p.m. May 11, 2006, through approximately 12:58 a.m. May 12, 2006. (SMF ¶ 113; Resp. SMF ¶ 113.)

Officer Poulin escorted Mr. Davenport into the booking room at approximately 23:48:22. (SMF ¶ 114; Resp. SMF ¶ 114.) Officer Dombroski was acting as dispatcher at that time. (SMF

13

¶ 115; Resp. SMF ¶ 115.)  Dispatcher Dombroski briefly entered the booking room at approximately 11:49:53 p.m. (SMF ¶ 10; Resp. SMF ¶ 10.) According to the defendants, Officer Dombroski had no role in the arrest of Davenport. (SMF ¶ 117; Dombroski Ans. Int. ¶ 13.) According to Davenport, Dombroski "took over the arrest" of Davenport at the police department.  (Resp. SMF ¶ 118; Davenport Aff. ¶ 24; ( Defs.' Ex. 11-1 (Booking Room Video).)

There is no dispute that, early on in the booking process, Mr. Davenport asks whether the proceeding was being videotaped. He is told that it was and is even told the location of the camera. (SMF ¶ 118; Resp. SMF ¶ 118.) Mr. Davenport was seated and a mandatory waiting period was commenced prior to the administration of an Intoxilyzer test.  (SMF ¶ 119; Resp. SMF ¶ 119.)  The process of testing breath samples for alcohol using the Intoxilyzer 5000 is an automatic process. (SMF ¶ 120; Resp. SMF ¶ 120.) The operator's tasks are limited to inputting identifying information regarding the individual being tested. (SMF ¶ 121; Resp. SMF ¶ 121.) Once beginning breath sample testing, the Intoxilyzer completes a series of pre-programmed steps that cannot be interrupted by the operator. (SMF ¶ 122; Resp. SMF ¶ 122.)  At a minimum, the Intoxilyzer requires that two breath samples be processed.  (SMF ¶ 123; Resp. SMF ¶ 123.) Should the subject fail to deliver an adequate breath sample on either test, the Intoxilyzer will automatically repeat testing up to four times. (SMF ¶ 124; Resp. SMF ¶ 124.)  The internal clock on the Intoxilyzer 5000 machine maintained in the booking room of the Caribou Police Department is set remotely by the State of Maine via telephone link once per week. (SMF ¶ 125; Resp. SMF ¶ 125.)  Caribou Police Department personnel have not been trained to set this clock manually. (SMF ¶ 126; Resp. SMF ¶ 126.) Times printed on test reports are governed by the Intoxilyzer's internal clock.  (SMF ¶ 127; Resp. SMF ¶ 127.)

Officer Poulin obtained Mr. Davenport's driving records. That record showed the following convictions:

Offense Date Charge Conviction Date
9/13/98 OUI 12/15/98
10/23/98 OUI 12/15/98
09/25/99 Driving while under suspension 12/09/99
05/31/04 Speeding 03/08/05

(SMF ¶ 128; Resp. SMF ¶ 128.) A third offense OUI is a Class C crime or a "felony" in the State of Maine.  (SMF ¶ 129; Resp. SMF ¶ 129.)

 Much of the time on the first part of the booking room video is consumed by having to start and restart the mandatory waiting period before Mr. Davenport can be tested. (SMF ¶ 130; Resp. SMF ¶ 130.)  At approximately 23:52:40, Mr. Davenport asked to use the bathroom and Officer Poulin allowed him to do so. (SMF ¶ 131; Resp. SMF ¶ 131.)  In the course of going to the bathroom, Mr. Davenport took a drink of water from a water fountain by the toilet. (SMF ¶ 132; Resp. SMF ¶ 132.)  Officer Poulin informed Mr. Davenport that the mandatory pre-test waiting period must be started again and instructed him not to take any more water.  (SMF ¶ 133; Resp. SMF ¶ 133.)  Officer Poulin restarted the waiting period. (SMF ¶ 134; Resp. SMF ¶ 134.)  At approximately 11:56 am Mr. Davenport asked Officer Poulin words to the effect of "if there is no alcohol allowed" [on a restricted license] "so why do this" [the breath test]? (SMF ¶ 135; Resp. SMF ¶ 135.)  At that time, Mr. Davenport's speech was abnormal. (SMF ¶ 136; Resp. SMF ¶ 136.)

Before the completion of the waiting period, Mr. Davenport, who has been furtively looking around the room, tore off a piece of paper from a form under a counter opposite where he is seated. (SMF ¶ 137; Resp. SMF ¶ 137.)  Mr. Davenport quickly puts the piece of paper in his mouth and started chewing. (SMF ¶ 138; Resp. SMF ¶ 138.)  Mr. Davenport claims that he

wanted to make a "spit ball" to throw at Officer Dombroski. (SMF ¶ 139; Resp. SMF ¶ 139.)

Officer Poulin noticed Mr. Davenport's actions and demanded that he take the item out of his

mouth and place it in a nearby trashcan. (SMF ¶ 140; Resp. SMF ¶ 140.)  Mr. Davenport

complied with Officer Poulin's command.  (SMF ¶ 141; Resp. SMF ¶ 141.) Officer Poulin then

searched the inside of Mr. Davenport's mouth to make sure that it was empty. (SMF ¶ 142; Resp.

SMF ¶ 142.)

      Because of Mr. Davenport's actions with the paper in his mouth, Officer Poulin was

required to restart the mandatory pre-test waiting period. Officer Poulin did so. (SMF ¶ 143;

Resp. SMF ¶ 143.)  Within 25 minutes of entering the booking room, Officer Poulin read Mr.

Davenport his duty to submit pursuant Maine's Implied Consent law a total of three times. (SMF

¶ 144; Resp. SMF ¶ 144.)  During the course of the waiting period, Mr. Davenport became

argumentative and demanded to make a phone call to his roommate and partner Wayne Smith.

(SMF ¶ 145; Resp. SMF ¶ 145.)  Officer Poulin initially resisted the idea of allowing these calls

prior to the administration of the Intoxylizer test, but acquiesced after the passage of several

minutes and continuous bantering on the topic by Mr. Davenport. (SMF ¶ 146; Resp. SMF ¶

146.)  Mr. Davenport made a total of three calls between 12:25 pm and 12:28 p.m., all of which

were apparently intercepted by a voice message machine. (SMF ¶ 147; Resp. SMF ¶ 147.)

      At the expiration of the mandatory waiting period Officer Poulin began Intoxylizer

testing. (SMF ¶ 148; Resp. SMF ¶ 148.)  Upon his initial attempt, Mr. Davenport did not blow

long enough into the machine. (SMF ¶ 149; Resp. SMF ¶ 149.)  Mr. Davenport was given the

opportunity to attempt the Intoxylizer test a second time. (SMF ¶ 150; Resp. SMF ¶ 150.)  On

this second attempt, he did not blow hard enough into the machine. (SMF ¶ 151; Resp. SMF

¶ 151.) One of Mr. Davenport's attempts is made without achievable results. (SMF ¶ 152; Resp.

16

SMF ¶ 152.)  The other does yield a .185 reading as demonstrated on the test result previously marked as Exhibit E in discovery. (SMF ¶ 153; Resp. SMF ¶ 153.)

The defendants insist that Mr. Davenport failed to complete his Intoxylizer test and was considered a refusal to submit to a breath test and was charged with OUI, a Class C crime. (SMF ¶ 154.)  Mr. Davenport insisted that was not a refusal but Officer Poulin believed that Mr. Davenport's failure to complete a valid test was due to lack of effort. (SMF ¶ 155; Poulin Aff. ¶ 20; Booking Room Video at 00:28:40- 00:31:00.)  Davenport responds that he performed the test as directed. (Resp. SMF ¶ 154; Booking Room Video at 00:24:40- 00:31:00.)  He states that he completed the test and that the mouthpiece was changed after the first blow did not register.  (Resp. SMF ¶ 155; Davenport Aff. ¶¶ 27, 28, 29, 20, 31.)[9]

The parties agree that, at approximately 12:37 a.m., Mr. Davenport's partner, Wayne Smith, arrived at the police station. (SMF ¶ 156; Resp. SMF ¶ 156.)[10]   As a result of seeing and talking to Mr. Davenport, Mr. Smith felt that he was under the influence of sleeping pills, alcohol, or a combination of both.  (SMF ¶ 157; Resp. SMF ¶ 157.)

Officer Dombroski, the dispatcher/booking officer on duty, had called a bail commissioner and was advised concerning what the bail was for Mr. Davenport for a third offense OUI would be (SMF ¶ 158; Dombroski Ans. to Int. ¶ 13), although Davenport maintains, in a conclusory fashion, that this did not occur (Resp. SMF ¶ 158; Davenport Aff. ¶ 35).  Officer Dombroski explained to Mr. Smith that bail had been set at $1,500 cash or $3,000 surety. (SMF ¶ 159; Resp. SMF ¶ 159; SAMF ¶¶ 223, 232; Resp. SAMF ¶ 223, 232.)  During that same

---

[9]     Davenport also indicates that he did not go to the bathroom, but the record citations to his affidavit do not support this counter-assertion.
[10]    Davenport asserts that Smith came to the police department while Davenport was taking the Intoxilyzer test.  (SAMF ¶ 231; Davenport Aff.  ¶26.) The defendants indicate that all attempts to have Davenport complete the test were completed by 12:30:30 a.m. (Resp. SAMF ¶ Booking Room Video at 00:29:46, 00:30:10; 00:30: 30; 00:37:10.)  This dispute has no material relevance to the resolution of this motion.

discussion, Officer Dombroski advised Mr. Smith and Mr. Davenport that, given Mr.

Davenport's level of intoxication, the bail commissioner would not accept Mr. Davenport's own

real estate as surety.  (SMF ¶ 160; Resp. SMF ¶ 160.) Officer Dombroski asked Mr. Smith if he

could come up with $1,500.00 cash to post bail for Mr. Davenport that night. (SMF ¶ 161; Resp.

SMF ¶ 161.)

      Mr. Smith told Officer Dombroski that he would not be able to come up with the cash

bail amount until the morning. (SMF ¶ 162; Resp. SMF ¶ 162.)  In fact, Mr. Smith had $1,200

cash at the home he shared with Mr. Davenport. (SMF ¶ 163; Resp. SMF ¶ 163.)   In addition,

Mr. Smith had the ability to withdraw up to $800 per day from his bank's ATM machine. (SMF

¶ 164; Resp. SMF ¶ 164.)  Mr. Smith went to the ATM machine later in the evening and only

withdrew $100. (SMF ¶ 165; Resp. SMF ¶ 165.)  The total amount of money available to Mr.

Smith that night was over the cash bail amount of $1,500. (SMF ¶ 166; Resp. SMF ¶ 166; SAMF

¶ 222; Resp. SAMF ¶ 222.)   On the night of Mr. Davenport's arrest, he was the sole owner of

the 22 Collins Street house where he and Mr. Smith lived. (SMF ¶ 167; Resp. SMF ¶ 167.)

Officer Dombroski asked Mr. Smith if he owned any property. (SMF ¶ 168; Resp. SMF ¶ 168.)

Mr. Smith told Officer Dombroski that he did not own any property. (SMF ¶ 169; Resp. SMF ¶

169.) Davenport relates that when Dombroski learned that Davenport had that much cash, he

stated: "He's not going anywhere until he sees a Judge in the morning." (SAMF ¶¶ 228, 233;

Davenport Aff. ¶56.)  The defendants deny this statement, relying on the manner in which the

bail issue was handled by Mr. Smith.  (Resp. SAMF ¶¶ 228, 233; Smith Dep. at 95-97; Booking

Room Video at 00:38:46-00:42:54.) Mr. Smith left the police station at approximately 12:43 with

a piece of paper upon which the bail amount had been written.  (SMF ¶ 170; Resp. SMF ¶ 170.)

At approximately 12:58 a.m. Officer Dombroski completed Mr. Davenport's booking process, including an inventory of the contents of Mr. Davenport's wallet and personal affects. (SMF ¶ 171; Resp. SMF ¶ 171.)  During the course of the wallet inventory, Officer Dombroski handled several pieces of paper currency. (SMF ¶ 172; Resp. SMF ¶ 172.)  Officer Dombroski filled out the inventory sheet upon which he listed the sum of $31.00 in paper currency. (SMF ¶ 173; Resp. SMF ¶ 173.)  The total of $31.51 is reported by Officer Dombroski on the book's inventory form. (SMF ¶ 174; Resp. SMF ¶ 174.)  The inventory form indicated the bail amount as $1,500 cash or $3,000 surety and identified the bail commissioner as "Camille." (SMF ¶ 175; Resp. SMF ¶ 175.)[11]

There is no dispute that a bail commissioner came in to bail two different people for OUI offenses.  (SAMF ¶¶ 219; 225; Resp. SAMF ¶¶ 219, 225.)[12]  Both of these individuals were released on $5000 unsecured bail and paid $40.00 to the bail commissioner.  (SAMF ¶ 221; Resp. SMF ¶ 221; Docket No. 26-3 at 1, 3.)  Davenport asserts that on the morning of May 12, 2006, the bail commissioner stated to him:  "You're still here?  I should have bailed you last night."  (SAMF ¶ 226; Davenport Aff. ¶ 57.) The defendants respond that this is a hearsay statement offered for the proof of the matter asserted.  (Resp. SAMF ¶ 226.)

Mr. Davenport's booking for OUI, Class C, was completed by 1:00 a.m. and thereafter Mr. Davenport was led to one of the two lockups just off the booking room. (SMF ¶ 176; Resp.

[11]	Davenport admits this in part, indicating that the bail commissioner, Camille Albert, did not set the bail amount.  (Resp. SMF ¶ 175.)  He cites to his own affidavit paragraphs which would not be admissible for the truth of the matter asserted.  He ardently maintains that Camille Albert was never called on his case (SAMF ¶ 224) but his Paragraph 35 is conclusory as there is no foundation for his personal knowledge of this fact.  (Davenport Aff. ¶ 35.)  In addition, Davenport insists that it was Officer Dombroski who set his bail amounts.  (SAMF ¶ 227.)  He likewise relies on a paragraph of his affidavit, ¶ 36, which is not admissible as evidence of the truth of this matter.
[12]	Davenport includes in his Paragraph 225 a representation that the bail commissioner did not ask to see him.  (SAMF ¶ 225.)  However, his affidavit Paragraph 37 is not admissible evidence in support of this proposition.

SMF ¶ 176.)  During his processing, Mr. Davenport stated to Officer Dombroski that he had not taken any medication at all that day.  (SMF ¶ 177; Resp. SMF ¶ 177.)

During the early morning hours of May 12, 2006, Officer Smith responded to the scene of an automobile accident and made an arrest of an OUI suspect by the name of Francis W. Friedell. (SMF ¶ 178; Resp. SMF ¶ 178.) Officer Smith arrested Mr. Friedell and transported him to the Caribou Police Department for processing. (SMF ¶ 179; Resp. SMF ¶ 179.)  Mr. Friedell was given an Intoxilyzer test only after Mr. Davenport had left the booking room. (SMF ¶ 180; Resp. SMF ¶ 180.)  The Intoxilyzer machine was operating correctly at the time of Mr. Friedell's test with a blood alcohol level of .15 being registered at 2:19 am on May 12, 2006.  (SMF ¶ 181; Resp. SMF ¶ 181.)

Mr. Davenport was released from the Caribou Police Department lock-up at approximately 7:50 a.m. the following morning, May 12, 2006. (SMF ¶ 182; Resp. SMF ¶ 182.) The bail at the time of Mr. Davenport's release was $500 unsecured bond, with the $40.00 fee for the bail commissioner. (SMF ¶ 183; Resp. SMF ¶ 183; SAMF ¶ 229; Resp. SAMF ¶ 229; Docket No. 26-3 at 2.)

### *Motion to Suppress*

On October 10, 2006, Superior Court Justice E. Allen Hunter heard Mr. Davenport's Motion to Suppress filed in the criminal action, <u>State of Maine v. Jeffrey Davenport</u>, CR 2006-225 (Aroostook County).  (SMF ¶ 103; Resp. SMF ¶ 103.) At that hearing, Officer Michael Poulin and former Deputy Sheriff Lawrence Goff testified as did Mr. Davenport. (SMF ¶ 104; Resp. SMF ¶ 104.)  Mr. Davenport was represented by counsel at that hearing. (SMF ¶ 105; Resp. SMF ¶ 105.)  Upon completion of the hearing on Mr. Davenport's Motion to Suppress, Justice Hunter made the following specific findings of fact:

20

a. That on May 11, 2006, Officer Poulin and Sergeant Goff observed two vehicles being operated in an unusual manner;
b. That Mr. Davenport stopped his vehicle on his own;
c. That given the erratic operation of Mr. Davenport's vehicle, a prudent police officer would investigate the situation;
d. That the interaction between Officer Poulin and Mr. Davenport at the window did not constitute a seizure; and
e. That the circumstance of the interaction between Mr. Davenport and Officer Poulin ripened into a situation justifying the further investigation of Mr. Davenport.

(SMF ¶ 106; Resp. SMF ¶ 106.) Justice Hunter denied Mr. Davenport's Motion to Suppress.

(SMF ¶ 107; Resp. SMF ¶ 107.)

### *Caribou Police Department Training Policies and Procedures*

The Caribou Police Department requires its officers to have law enforcement Pre-Service training prior to being hired. A copy of that policy has been marked as Exhibit GG for discovery in the lawsuit. (SMF ¶ 184; Resp. SMF ¶ 184.)  Pursuant to that policy, individuals are required to pass a course of 100 hours of instruction which has been certified by the Maine Criminal Justice Academy.   (SMF ¶ 185; Resp. SMF ¶ 185.)  The 100 hours of instruction has been required in Maine since 1989.  (SMF ¶ 186; Resp. SMF ¶ 186.)  That curriculum requires instruction in various aspects of law and police procedures, including Maine Motor Vehicle law, laws of arrest, search and seizure, report writing, traffic law enforcement. (SMF ¶ 187; Resp. SMF ¶ 187.)   Officers Michael Poulin and Shawn Smith, who were both hired after 1989, met this requirement. (SMF ¶ 188; Resp. SMF ¶ 188.)

The Caribou Police Department requires its individual officers to attend and graduate from the full Basic Law Enforcement School of the Maine Criminal Justice Academy within one year of hiring. This policy has been previously marked as Exhibit HH for discovery in the lawsuit. (SMF ¶ 189; Resp. SMF ¶ 189.)   In order to be admitted to the Basic Law Enforcement

21

Training program at the Maine Criminal Justice Academy, an individual must meet several minimum standards concerning education, age, medical and physical fitness and moral conduct. (SMF ¶ 190; Resp. SMF ¶ 190.)  The Basic Law Enforcement training program contains a total of 720 hours and covers in additional detail various facets of police law, legal procedures, communications, investigation and patrol procedures and results in a person being a certified police officer.  (SMF ¶ 191; Resp. SMF ¶ 191.)  Officers Barry Dombroski and Shawn Smith met this requirement. (SMF ¶ 192; Resp. SMF ¶ 192.)  On May 11, 2006, Officer Michael Poulin, who was within a year of hire as a certified reserve officer, was pending completion of this requirement. (SMF ¶ 193; Resp. SMF ¶ 193.)

The City of Caribou requires its officers to undergo annual training updates of twenty hours of additional training per year as mandated by the Maine Criminal Justice Academy. (SMF ¶ 194; Resp. SMF ¶ 194.)  The Caribou Police Department and its officers use the Law Enforcement Officer's Manual as a reference guide to Maine law. (SMF ¶ 195; Resp. SMF ¶ 195.)

The Caribou Police Department maintains a policy concerning OUI detection, pre-arrest screening, arrest, and processing. This policy has been previously marked as Exhibit O for discovery in the lawsuit. (SMF ¶ 196; Resp. SMF ¶ 196.) The OUI policy is adopted from the recommendations of the Maine Criminal Justice Academy. (SMF ¶ 197; Resp. SMF ¶ 197.) Nothing in Officer Poulin's conduct as a police officer in Caribou or in Limestone, where Chief Gahagan had supervised him in the past, would have led Chief Gahagan to believe that he was not familiar with the policies and procedures concerning OUI detection, pre-arrest, screening, arrest and processing before May 11, 2006. (SMF ¶ 198; Resp. SMF ¶ 198.) Davenport further maintains that it is the policy of the Caribou Police Department to release an OUI suspect to a

responsible third party whenever possible and/or practical. (SAMF ¶ 230.)  The defendants

respond that whether to release someone is based on several factors including specific statutory

requirements, the level of intoxication, and the location of the party to assume custody.    They

point out the policy does not mandate the release to a third party but supports it.   (Resp. SAMF

¶ 230; Ex. 22 ¶ 8.)

   The Caribou Police Department has express policies concerning hate/bias crimes which

makes it a policy of the Caribou Police Department to safeguard the state and federal

constitutional rights of all individuals irrespective of their race, religion, ethnic background, or

sexual orientation. This policy has been previously marked as Exhibit P for discovery in the

lawsuit.  (SMF ¶ 199; Resp. SMF ¶ 199.) The hate/bias crime policy is adopted from the

recommendations of the Maine Criminal Justice Academy. (SMF ¶ 200; Resp. SMF ¶ 200.)

Specifically, Caribou Police Department General Order (2-20) dictates that it is the Department

policy "to safeguard the state and federal rights of all individuals irrespective of their race,

religion, ethnic background or sexual orientation." (SMF ¶ 201; Resp. SMF ¶ 201.)  Prior to May

11, 2006, the Caribou Police Department had no information concerning a violation of this

policy by Officer Poulin, Officer Smith or Officer Dombroski. (SMF ¶ 202; Resp. SMF ¶ 202.)

   The Caribou Police Department has procedures and policies for its holding facility, where

Mr. Davenport spent the early morning hours of May 12, 2006. This policy has been previously

marked as Exhibit KK-2 for discovery in the lawsuit. (SMF ¶ 203; Resp. SMF ¶ 203.)  The

procedures in place require that a bail commissioner be contacted if bail, other than personal

recognizance by the officer, is to be set. (SMF ¶ 204; Resp. SMF ¶ 204.)

   Prior to May 11, 2006, the records of the Caribou Police Department show that none of

the officers involved with Mr. Davenport had ever been disciplined for violation of police

procedures involving OUI arrests and procedure, arrests, searches, reporting of events or processing of bail. (SMF ¶ 205; Resp. SMF ¶ 205.)  The Caribou Police Department had in effect policies concerning complaints against police officers, internal investigations and criminal or other misconduct by police officers. This policy has been previously marked as Exhibit O-2 for discovery in the lawsuit. (SMF ¶ 206; Resp. SMF ¶ 206.)  The complaint against police officers policy is adopted from the recommendations of the Maine Criminal Justice Academy.  (SMF ¶ 207; Resp. SMF ¶ 207.) The Caribou Police Department had no information concerning prior citizens' complaints against either Officer Poulin or Officer Smith. (SMF ¶ 208; Resp. SMF ¶ 208.)

      The Caribou Police Department has a policy concerning the discipline of police officers which sets forth procedure for discipline and penalties imposed. This policy has been previously marked as Exhibit O-1 for discovery in the lawsuit. (SMF ¶ 209; Resp. SMF ¶ 209.) The discipline policy is adopted from the recommendations of the Maine Criminal Justice Academy. (SMF ¶ 210; Resp. SMF ¶ 210.)  The discipline includes a prohibition involving sexual harassment and other types of discrimination. (SMF ¶ 211; Resp. SMF ¶ 211.) Prior to May 11, 2006, Chief Gahagan had no information that Officers Poulin, Smith and Dombroski were engaged in conduct that would suggest they were making arrests without probable cause, denying people bail, or fraudulently executing police records. (SMF ¶ 212; Resp. SMF ¶ 212.)

      In October 1999 the Caribou Police Department was aware that a complaint had been received from Mr. Davenport by the Attorney General's Office against Officer Dombroski and another Caribou Police Officer who is no longer with the Department. The reports of the members of the Caribou Police Department concerning the incident were marked as Exhibit S for discovery in the lawsuit. (SMF ¶ 213; Resp. SMF ¶ 213.)  Mr. Davenport claimed that Officer

24

Dombroski had filed a "distorted" police report in connection with a domestic complaint involving Mr. Davenport's mother and stepfather.  (SMF ¶ 214; Resp. SMF ¶ 214.)  That matter was reviewed by the Attorney General's Office and determined to be not appropriate for further action.  (SMF ¶ 215; Resp. SMF ¶ 215.)   The Attorney General's Office advised Mr. Davenport to make a complaint to the Caribou Police Department concerning the incident. (SMF ¶ 216; Resp. SMF ¶ 216.)  There is no record of Mr. Davenport making any such complaint. (SMF ¶ 217; Resp. SMF ¶ 217.)

***Unreasonable Search and Seizure***

In his responsive memorandum Davenport joins issue with the defendants on his "unreasonable search and seizure" claim, asserting "an unreasonable seizure as a result of the failure on the part of Officer Poulin to effectively undertake a probable cause arrest."  (Mem. Opp'n Mot. Summ. J. at 9.)  He cites to Officer Smith's video of the arrest opining, "it is difficult to imagine that Officer Poulin could have arrived at probable cause without conducting appropriate filed sobriety test."  (Id.)   "It is well understood," Davenport maintains, "that the determination of probable cause cannot be made without application of the entire battery of [National Highway Transportation Safety Administration] tests."  (Id.)  Davenport does not provide any citation for this "well understood" proposition.

For their part, the defendants argue, first and foremost, that the question of whether or not there was probable cause to stop Davenport was litigated in the state court criminal matter vis-à-vis a motion to suppress:

> It is "well established that the doctrine of collateral estoppel, or issue preclusion, applies in civil rights actions brought pursuant to 42 U.S.C. § 1983." Smith v. Jackson, 463 F.Supp.2d 72, 76 (D. Me. 2006) (citing Cinelli v. Revere, 820 F.2d 474, 479 (1st Cir. 1987) (supplemental opinion); Davis v. Schifone, 185 F.Supp.2d 95, 100 (D. Mass. 2002)). A federal court "must give the same

25

preclusive effect to issues already decided as would be given by the courts of the state in which the federal court sits." Smith, 463 F.Supp.2d at 76 (Cinelli, 820 F.2d at 479; see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 466 (1982); 28 U.S.C. § 1738).

Maine law is in accord holding that issue preclusion, or collateral estoppel, "prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment, and the party estopped had a fair opportunity and incentive to litigate the issue in a prior proceeding." Portland Water Dist. v. Town of Standish, ___ A.2d___, 2008 WL 251988, *2 (Me. 2008) (citing Macomber, 2003 ME 121, ¶ 22, 834 A.2d at 138-39); State v. Hughes, 863 A.2d 266, 268 (Me. 2004). Collateral estoppel concerns factual issues, and applies even when the two proceedings offer different types of remedies. Id. A party has a fair opportunity to litigate an issue if that party either controls the litigation, substantially participates in that litigation, or could have participated in the litigation had they chosen to do so. Hughes, 863 A.2d at 269 (citations omitted).

Here, on October 10, 2006 Superior Court Justice E. Allen Hunter heard Mr. Davenport's Motion to Suppress filed in the criminal action in the State of Maine v. Jeffrey Davenport, CR-2006-225 (Aroostook County). (Def. SMF at ¶ 103). Following the testimony of Officer Poulin, former Deputy Chair and eyewitness Lawrence Goss and Mr. Davenport, Justice Hunter denied the Plaintiff's motion to suppress finding that there was adequate legal basis for the officer to approach the vehicle and conduct the investigatory stop that was done. (Def. SMF at ¶¶ 106-107). Having presented a vigorous motion through counsel and lost, Plaintiff cannot now relitigate an unlawful stop claim in the context of a civil rights action.

(Poulin Mot. Summ. J. at 3-4.)

The transcript of Davenport's motion to suppress hearing covers sixty-nine substantive pages, sixty-four of which address Davenport's motion to suppress. (See Docket No. 22-30 at 5-71.) The motion to suppress was focused on the question of "whether or not the officer had an articulable suspicion to justify the initial stop." (Id. at 3.) During the hearing, Davenport's defense attorney objected to the admission of any testimony from the officers that described Davenport's conduct after the point that Officer Poulin was at the vehicle's door, in other words, after "the stop." (Id. at 14-16.) At that point the officer indicated that Davenport's eyes were glassy, his speech was impaired, and he smelled of alcohol. (Id. at 16-17.) The officer concluded at this juncture that Davenport might be an intoxicated operator. (Id. at 17.) The motion judge

26

watched the video of the stop which commenced when Officer Smith arrived.  (Id. at 20-21, 49, 59 -60.)

Davenport also took the stand and his attorney focused on eliciting testimony that Davenport felt 'boxed in' prior to his conversation with Officer Poulin.  (Id. at 37-41.)     The prosecutor asked Davenport, over defense counsel's objection, if he recalled what his blood-alcohol level was on the night in question to which Davenport responded that he did not recall this, that he had consumed alcohol several hours before, and that he went into the parking lot because he had taken a couple of sleeping tablets and did not feel well, so was going to use the phone at the Tiki Bar.  (Id. at 41-43.)  He insisted that there was no other vehicle involved with his presence there at any time.  (Id. at 48.)  In rebuttal Officer Poulin testified that he did a blood-alcohol test on Davenport and the result was a .185.  (Id. at 56.)

The motion judge made the following factual findings:

[O]n May 11th of 2006 at approximately eleven thirty in the evening Officer Michael Poulin of the Caribou Police Department was station in the parking lot of the  Maine Motor Vehicle  Department building on Bennett Drive here in Caribou, he had come into contact at about that time with the Aroostook County Sheriff's Department Sergeant Larry Gough, was at the Any Time Money machine that is in the immediate vicinity of the DVM building, and the two men fell into casual conversation with regard to their work responsibilities and duties and events of the evening.  At  -- and at about the same time Officer Poulin observed two cars traveling eastbound on Bennett Drive.  One was in close proximity behind the other.  Both vehicles made an abrupt turn into the Skyway Plaza ....  It is obvious from the video exhibit that I have observed, and also from the Court's common knowledge of what's happening in that part of town at eleven thirty in the evening, that none of the businesses there were open for business, with the possible exception of the Tiki Lounge that Mr. Davenport referred to and indicated was his ultimate objective.  But everything – every other business was essentially closed. The parking lot was essentially empty.  And Officer Poulin observed, as did Officer Gough – observed the vehicle being operated in an unusual manner.  I should say vehicles being operated in an unusual manner.  We had the abrupt turns.  We had the speed of the vehicles, one of which did accelerate.  We have the serpentine operation of one of these vehicles, and just a general impression that the two vehicles appeared to be connected in some

27

fashion.  The lead vehicle was the Saturn vehicle which pulled all the way into the parking lot and traveled toward the further end where it turns and appeared to face the direction that it had just come from.  The other vehicle, which was the maroon station wagon being operated by the defendant, also pulled in, made a turn – sort of a full turn and wound up also pointed in the direction of the Saturn, although some apparent – apparently some considerable distance apart.  Officer Poulin responded to this unusual motor vehicle operation by leaving the DMV building parking lot, traveling across the street, which is where the Skyway Plaza shopping mall is located, and proceeded towards generally the front of the Davenport vehicle.

(Id. at 65-66.)

Davenport attempts to overcome this issue preclusion argument:   "Plaintiff disagrees with the Defendants in their legal argument that one can paint with the broad brush of federal law the fine details of the doctrine of collateral estoppels or issue preclusion as it applies in civil rights actions concerning elements of State criminal actions."  (Mem. Opp'n Mot. Summ. J. at 10.)   Talk about broad-brush equivocation.   However, and to his credit, he closes his case on this score by acknowledging the holding of Kyricopoulos v. Town of Orleans, 967 F.2d 14 (1st Cir. 1992) which held that the 42 U.S.C. § 1983 plaintiff could not relitigate the question of probable cause for his arrest when the question was decided against him in the context of his criminal proceedings.   This case is right on point, save that the issue preclusion law was that of Massachusetts rather than Maine.  However, there is no question that Maine, like Massachusetts, permits the application of issue preclusion in circumstances where the party asserting estoppel was not formally a party to the prior litigation, when other factors favor preclusion.  See Hossler v. Barry, 403 A.2d 762, 770 & n.6 (Me. 1979).

 In his argument in defense of summary judgment Davenport conflates his argument with respect to the permissibility of the stop and the probable cause for arrest.  It is evident from the criminal record cited above that Davenport  -- in pressing his motion to suppress -- was

attempting to avoid evidence of his intoxicated state in pressing his argument that the stop ran

afoul of the Fourth Amendment.  The criminal record in Kyricopoulos was ambiguous as to just

how directly the question of probable cause was confronted by the criminal trial court.  See 967

F.2d at 16-17.  The First Circuit reasoned that even if the evidence of whether the probable cause

issue had or had not been directly raised was sketchy, it was "more than sufficient to show that

appellant had a 'full and fair opportunity' to raise the probable cause question at his criminal

trial."  Id. at 17.  The transcript of the motion to suppress in Davenport's case bears witness to

Davenport having had "both the incentive and the opportunity to fully and fairly litigate the

issues in the criminal proceeding," Pattershall v. Jenness, 485 A.2d 980, 983 (Me. 1984), and

under these circumstances, it would be fair to preclude Davenport from raising his probable

cause for arrest argument as well as his investigatory stop claim.

However, even on the merits, his 42 U.S.C. § 1983 'probable cause' claim has no legs.

Davenport has advanced no legal authority for his claim that the determination of probable cause

for an operating under the influence charge (particularly on a so-restricted license) cannot be

made without application of the entire battery of National Highway Transportation Safety

Administration tests.  I could not locate a single federal case that joined the issue of National

Highway Transportation Safety Administration tests and probable cause to arrest.

Per the constitutionality of a warrantless arrest, Logue v. Dore summarized, it:

"depends ... upon whether, at the moment the arrest was made, the officer [ ] had
probable cause to make it."  Beck v. Ohio, 379 U.S. 89, 91 (1964). In turn,
probable cause to make an arrest exists if-and only if-the facts and circumstances
of which the arresting officer has knowledge are sufficient to lead an ordinarily
prudent officer to conclude that an offense has been, is being, or is about to be
committed, and that the putative arrestee is involved in the crime's commission.
See Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir.1992); Hoffman v. Reali, 973
F.2d 980, 985 (1st Cir.1992). In sum, the existence of probable cause (and, in
turn, the validity of an ensuing arrest) is gauged by an objective standard; as long

as the circumstances surrounding the event warrant the officer's reasonable belief
that the action taken is appropriate, the arrest is justified. See Scott v. United
States, 436 U.S. 128, 137-38 (1978); United States v. Figueroa, 818 F.2d 1020,
1023 (1st Cir.1987); see also Whren v. United States, 517 U.S. 806, [813] (1996)
(holding that "[s]ubjective intentions play no role in ordinary, probable-cause
Fourth Amendment analysis"). And, moreover, though probable cause requires
more than mere suspicion, it does not require the same quantum of proof as is
needed to convict. See United States v. Aguirre, 839 F.2d 854, 857-58 (1st
Cir.1988).

103 F.3d 1040, 1044 (1st Cir. 1997).

Although he argues that Officer Poulin did not perform all the sobriety tests he professes

to have, Davenport has admitted the following key facts.  Davenport had a "Q" restricted license

which prohibits his use of any alcohol beverages before operating a motor vehicle. He told

Officer Poulin that he was aware of that restriction. Officer Poulin could tell that Davenport was

in violation of the no alcohol restriction immediately as he detected an overwhelming odor of

alcoholic on Mr. Davenport's breath and he also observed that Davenport's speech was slow and

slightly slurred and that Mr. Davenport' eyes were glassy.  Officer Poulin asked Davenport how

much he had to drink and Davenport indicated that he had consumed a couple of Vodka drinks

approximately one hour before, which may have been single or double drinks and for Davenport

to have had any alcohol would be a violation of his license restriction which prohibits alcohol

use of any amount.  Officer Poulin inquired if Mr. Davenport had ingested any medication and

Davenport told him that he had taken one sleeping pill approximately six hours previously; he

had taken a sleeping pill prior to leaving his house at 6:00 p.m. that evening. Because he felt that

the sleeping medication he had ingested prior to leaving his home was not working, Davenport

ingested two more sleeping pills at approximately 9:30 p.m.[13]  When Poulin asked Davenport to

---

[13]     It does baffle the mind that he thought it was necessary to take sleeping medication twice when he knew
that what he would be doing next was driving.

count in order from 33 to 54, Davenport counted 33, 34, 35, long pause, 36, 37, 38, 39, 40, 41, 42, 43, long pause, and then finished satisfactorily. Poulin observed that Davenport's speech was also slightly slurred while completing the number test.  There is no dispute that, upon exiting the vehicle, Davenport was unsteady on his feet and had an overwhelming smell of intoxicating liquor about him. Once out of the vehicle, Mr. Davenport began slowly rocking back forth. Officer Poulin determined that there was sufficient probable cause to believe that Davenport had committed the crime of operating a motor vehicle under the influence of intoxicating liquor.

On these facts I have absolutely no hesitation in concluding that, even if Davenport is not precluded from raising a lack of probable cause claim in this action, the defendants are entitled to summary judgment on any claim that there was not probable cause to arrest Davenport.

### Civil Conspiracy

A civil rights conspiracy as commonly defined is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.' " Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754  (1980) (quoting Rotermund v. United States Steel Corp., 474 F.2d 1139 (8th Cir.1973)). This court has ruled that for a conspiracy to be actionable under section 1983 the plaintiff has to prove that "there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws." Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir.1980). See generally S. Nahmod, Civil Rights and Civil Liberties Litigation § 2.11 (1986).

Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988). Davenport has failed to create a genuine dispute apropos his proposition that he suffered "an actual deprivation of a right secured by the Constitution and laws."[14]

---

[14]     I note here that with regards to his memorandum argument defending summary judgment Davenport alludes to many factual scenarios that he has utterly failed to put into the paper-trail-summary-judgment record.

On this score a few facts are worth highlighting. There is no dispute that Officer Poulin had no contact with Davenport prior to May 11, 2006, and that Officer Poulin did not know of Davenport's sexual orientation. Officer Smith had never met Davenport nor was he aware of Davenport's sexual orientation before May 11, 2006. Davenport thinks that the alleged failure to do a full array of sobriety tests is evidence of a predetermination to arrest him but the undisputed facts recited above in the probable cause discussion entirely undercut such an inference. "'[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.'" <u>Scott</u>, 127 S. Ct. at 1776 (quoting <u>Anderson</u>, 477 U.S. at 247-48). I repeat, Davenport cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'" <u>Mariani-Colon</u>, 511 F.3d at 224. Furthermore, the matter of the 3:00 a.m. 'delayed' call concerning Davenport's license and registration and the question of the availability of bail are ineffectual makeweights given the record generated by the defendants.

### *Failure to Train*

<u>City of Canton v. Harris</u>[15] held "that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. 378, 388 (1989) (footnote omitted). To maintain such a claim "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>Id.</u> at 390. Davenport "must establish that the particular officers who <u>committed the</u>

---

[15]    Of course the classic "failure to train" case involves a municipality, i.e. the City of Caribou. Although Davenport names the City as a defendant, his memorandum does not defend the failure to train claim vis-à-vis the City's liability.

violation had been deprived of adequate training, and that this specific failure in training was at least a partial cause of the ultimate injury." Whitfield v. Melendez-Rivera, 431 F.3d 1, 10 (1st Cir. 2005) (citing Young v. City of Providence, 404 F.3d 4, 26 (1st Cir.2005)) (emphasis added). Davenport aims his failure to train claim at Chief Gahagan (Mem. Opp'n Mot. Summ. J. at 13); this court has indicated that inadequate training of subordinates may form a basis for a claim against a supervisor under § 1983, although such a claim brought against the Chief in his individual capacity would not be the same animal as a municipal liability claim. Buchanan ex re. Estate of Buchanan v. Maine, 417 F. Supp. 2d 45, 69 (D. Me. 2006) (citing Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir.1994)).

As addressed above, the only underlying constitutional violation that is defended by Davenport is the "unreasonable search and seizure" claim that boils down to an argument that he was arrested without probable cause. Even if this claim is not precluded by the state court's criminal adjudication, based on the undisputed facts, Officer Poulin had probable cause to arrest Davenport. Therefore, there is no particular officer that "committed the violation" or inflicted "the ultimate injury." Whitfield, 431 F.3d at 10.

What is more, even if this was not the state of the evidence in this summary judgment record, Davenport has not placed into dispute the paragraphs of fact advanced by the defendants in support of their assertion that the training policies and practices are sufficient to prevent constitutional violations. (See SMF ¶¶ 184-218; Resp. SMF 184-218.) Davenport does maintain that it is the policy of the Caribou Police Department to release an OUI suspect to a responsible third party whenever possible and/or practical. (SAMF ¶ 230.) The defendants respond that the decision whether or not to release someone is based on several factors including specific statutory requirements, the level of intoxications, and the location of the party to assume custody.

33

They point out the policy does not mandate the release to a third party but supports it.   (Resp. SAMF ¶ 230; Ex. 22 ¶ 8.)  That is the extent of Davenport's <u>record</u> evidence which even comes close to challenging the training policies and practices.

Davenport insists in his opposition memorandum that the Caribou Police Department "has a custom of discriminating against this Plaintiff based on his sexual orientation" citing what he sees as the denial of his right to make bail that night.  (Mem. Opp'n Summ. J. at 12.) He opines:

> Plaintiff is a well known Caribou man and homosexual. Plaintiff had enormous difficulties with the City of Caribou regarding discriminatory acts of zoning regulation applications. See Exhibit 5. Plaintiff had an altercation with Defendant Dombrowski in Plaintiff's home several years prior to this incident and Plaintiff had complained to the Police Chief concerning Officer Dombrowski's previous behavior. Though others on the same night with as high or higher blood alcohol content were admitted to personal recognizance bail, this Plaintiff, a homosexual man, was at first granted bail, but when it was learned that he was able to make that bail, was denied bail and told that he would be held overnight until he saw a judge in the morning. There was no judge in Caribou the next morning.

(<u>Id.</u> at 12-13.)  This summary judgment record lacks evidence to support this paragraph of the memorandum.  If this were a trial, the recitation amounts to a blatantly improper closing argument, as it assumes facts that are not in evidence.  If Davenport conceived of this case as a custom and practice case based upon a department-wide custom of discriminating against homosexuals in general and him in particular, he had an obligation to develop a very different record in response to this summary judgment motion.

### *Conclusion*

For the reasons set forth above, I recommend that the Court grant the motions for summary judgment advanced by all the defendants (Docket Nos. 17, 18, 19, 20, 21).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

May 22, 2008

35